**PBA LOCAL NO. 38, et al., Plaintiffs,**

v.

**The WOODBRIDGE POLICE DEPART-MENT, The Township of Wood-bridge, et al., Defendants.**

**Civ. A. No. 89–3314 (MTB).**

United States District Court,
D. New Jersey.

Sept. 9, 1993.

Smith, Mullin & Kiernan by Nancy Erika Smith, Kyle M. Francis, West Orange, NJ, for plaintiffs.

Weiner Lesniak by Richard L. Rudin, Roseland, NJ, for defendants Tp. of Woodbridge Police Dept. and Tp. of Woodbridge.

Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl by Anthony M. Campisano, Rosalind Westlake, North Brunswick, NJ, for defendant Joseph Galassi.

Dwyer Connell & Lisbona by William T. Connell, Thomas R. Walters, Montclair, NJ, for defendant Walter Zirpolo.

Mary B. Rogers, Newark, NJ, for defendant New Jersey Bell.

Palmisano & Goodman by Joseph Ricigliano, Jr., Woodbridge, NJ, for defendant Anthony O'Brien.

*OPINION*

BARRY, District Judge.

## I. Introduction

Plaintiffs, PBA Local No. 38 and certain current and former police officers of the Township of Woodbridge, bring this action against the Woodbridge Police Department and the Township of Woodbridge (together "the Woodbridge defendants"), the former and current Police Directors, the former Mayor of the Township of Woodbridge, and New Jersey Bell Telephone Company ("NJB"). Plaintiffs allege that electronic listening and taping devices were surreptitiously placed in certain areas of police headquarters and on the building's phone lines. As a result, they allege, their private conversations were unlawfully intercepted. Specifically, plaintiffs bring six separate claims: (1) violation of 42 U.S.C. § 1983 in that the surveillance was under color of state law and in violation of their constitutional right to privacy under the Fourth, Fourteenth, First, and Ninth Amendments (First Count); (2) violation of the New Jersey Wiretapping and Electronic Surveillance Control Act, N.J.S.A. 2A:156A–1 *et seq.* ("New Jersey Wiretap Act") (Second Count); violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended by the Electronic Communications Privacy Act of 1986, Pub.L. No. 99–508, 100 Stat. 1848 (1986), 18 U.S.C. §§ 2510–20 ("Federal Wiretap Act") (Third Count); conspiracy to violate federal statutory and constitutional rights pursuant to 42 U.S.C. §§ 1983 and 1985 (Fourth Count);[1] violation of their right to privacy under the New Jersey Constitution and New Jersey common law (Fifth Count); and "intrusion upon seclusion" (Sixth Count). Now before the court are numerous motions for summary judgment by defendants on various grounds and plaintiffs' motion for leave to file a fourth amended complaint. For the reasons which follow, defendants' motions will be granted in part and denied in part and plaintiffs' motion will be denied.

---

1. Plaintiffs concede that they cannot state a cause of action under 42 U.S.C. § 1985. Accordingly, summary judgment will be granted in favor of all defendants as to that claim.

## II. Procedural History and Factual Background

Much of the relevant factual background is set forth in the court's opinion denying plaintiffs' motion for class certification and defendants' motion to dismiss. *See PBA Local No. 38 v. Woodbridge Police Department,* 134 F.R.D. 96, 97–99 (D.N.J.1991). Because certain aspects of the case have changed since that opinion was issued, however, the court will briefly set forth the parties and the facts relevant to these motions.

### A. The Parties

Plaintiff PBA Local No. 38 is the collective bargaining representative of the officers employed at the Woodbridge Police Department. The remaining plaintiffs are sixteen current or former officers employed by the Department—Joseph Festa, William Matelski, Thomas Polhamus, Richard Bernat, George Conklin, Thomas Barajas, Robert Barajas, David Whitaker, Patrick Donnelly, John Trainor, John Schreck, James Kirby, Robert Hodes, Ronald Nier, and Joseph Covino.[2] *See* October 16, 1991 Order of the Hon. Stanley R. Chesler, U.S.M.J. (permitting amendment of the complaint to add these plaintiffs).

Defendant Joseph Galassi served as Director of the Woodbridge Police Department from 1963 to 1984. Final Pretrial Order Stipulation of Facts (hereinafter "Stip.") ¶ 1. Defendant Anthony O'Brien became a Woodbridge Police Officer in 1957 and worked his way up through the ranks, eventually succeeding Galassi as Director of Police in 1984. *Id.* ¶¶ 8–15. Defendant Walter Zirpolo, now deceased, served as Mayor of Woodbridge from 1962 to 1967. Zirpolo hired Galassi as Director of Police during his tenure as Mayor. *Id.* ¶ 7. Defendant NJB is a regulated public utility and a communication common carrier. *Id.* ¶ 6. NJB installed certain equipment in the Woodbridge Police Department station house.[3]

### B. Procedural History

Plaintiffs filed a complaint in the Superior Court of New Jersey on May 3, 1988. The Hon. Robert A. Longhi, J.S.C., initially denied class certification but later vacated that ruling and certified a class action. The state court action was, nonetheless, subsequently dismissed without prejudice. Plaintiffs filed a complaint in this court in August, 1989 on behalf of a class comprised of all persons who worked as police officers for the Woodbridge Police Department from 1964 to 1985 and their families and associates who visited or telephoned the station house during that time. In its previous opinion, the court denied plaintiffs' motion to certify the class. *PBA Local No. 38,* 134 F.R.D. at 102. Moreover, the court made clear at that time what was required for an individual plaintiff to have standing: "At a minimum, a named plaintiff must demonstrate the actual interception of at least one of his or her conversations before there can be a justiciable controversy within the meaning of Article III. Where there has been no interception, there can have been no injury." *Id.* at 100–01.

Subsequent to the denial of class certification, plaintiffs moved to amend the complaint to join 233 other individuals as plaintiffs in the action. Consistent with this court's prior ruling, Magistrate Judge Chesler granted the motion in part and denied it in part, permitting the complaint to be amended to include as plaintiffs the sixteen individuals who were able to demonstrate that they had at least one conversation intercepted. *See* Order dated October 16, 1991. Discovery has been completed and, defendants', dispositive motions and plaintiffs' motion for leave to file a fourth amended complaint aside, the case is ready for trial. The court notes, however, that although trial there will be, it has grave doubts that even if some or all of the plaintiffs who go to trial prevail on the merits,

---

**2.** The claims of Kevin Cuffe, who was originally included as a plaintiff in the third amended complaint, have been dismissed by consent order.

**3.** Certain defendants initially named in the complaint are no longer parties to the litigation. Defendant Motorola was dismissed as a party

early on in the litigation. The claims against defendant Mobile Dispatch Radio, Inc. were settled in May, 1991. Finally, the court granted defendant Dictaphone's motion for summary judgment in September, 1991.

other than the most minimal damages can be proven.

## C. Factual Background

The general factual background of this litigation is set forth in the court's previous opinion. Specific factual arguments and evidence relating to specific claims or specific defendants will be discussed in the context of the court's legal analysis of these motions.

## III. Defendants' Motions

The motions for summary judgment present a complex web of legal arguments and factual references. There are five separate defendants moving for summary judgment on some or all of the six counts of the third amended complaint. While some arguments are made by more than one defendant or are joined *post hoc* by other defendants, there are numerous arguments which apply to one defendant alone, one or a few plaintiffs, or only one or a few of the counts of the complaint.

## A. Statute of Limitations

In its previous opinion, the court noted that because the accrual of the statute of limitations as to each plaintiff will depend on an individualized determination as to when he became aware of both the fact of injury and the causal connection to one or more of the defendants, statute of limitations issues could not be resolved on class-wide basis. *PBA Local No. 38,* 134 F.R.D. at 106. Finding defendants' evidence regarding the statute of limitations inconclusive at that juncture, the court invited a renewed motion on statute of limitations grounds "should additional discovery clarify what is now unclear." *Id.*

NJB, joined by Galassi, O'Brien, and Zirpolo, now argues that plaintiffs' claims are barred on statute of limitations grounds. The Woodbridge defendants renew the statute of limitations argument only with respect to plaintiff PBA Local No. 38. All defendants' arguments must fail. Plaintiffs do not dispute that all their claims are subject to a two-year statute of limitations, whether under federal law or state law. *See Wilson v. Garcia,* 471 U.S. 261, 280, 105 S.Ct. 1938,

1949, 85 L.Ed.2d 254 (1985) (state personal injury statute of limitations should be applied to § 1983 claims); 18 U.S.C. § 2520(e) (amendment to federal anti-wiretapping statute, effective January, 1987, setting a statutory two-year limitation period); *Awbrey v. Great Atlantic & Pacific Tea Co.,* 505 F.Supp. 604, 607 (N.D.Ga.1980) (prior to amendment of Federal Wiretap Act, applying the state's two-year statute of limitations applicable to the tort of invasion of privacy); N.J.S.A. 2A:14–2 (general personal injury statute of limitations of two years). Plaintiffs filed their federal complaint on August 2, 1989. The question, then, is whether the court can determine as a matter of law that any or all of the plaintiffs' claims against defendants accrued prior to August 2, 1987.

NJB argues that the attorney for PBA Local No. 38, Raymond Gill, Esq., knew of the existence of a State Police report in December, 1986, that report put him on notice of plaintiffs' cause of action, and, thus, the cause of action should be deemed to have accrued as of that date and certainly no later than February 2, 1987, as evidenced by counsel's letter of that date to the New Jersey Attorney General's Office. Pl.Opp.Br., Exh.F. NJB suggests, moreover, that plaintiffs' cause of action could well have accrued on June 21, 1985, the date on which the State Police did a "sweep" of police headquarters. But NJB's statute of limitations argument makes utterly no reference to the knowledge or awareness of any individual plaintiff, rather treating all plaintiffs as one. NJB apparently fails to appreciate the court's previous statement that the accrual of the statute of limitations requires an inquiry which is "specific to each plaintiff and . . . obviously ill suited to general disposition on a class-wide basis." *PBA Local No. 38,* 134 F.R.D. at 106. Parenthetically, this point was not lost on the Woodbridge defendants, who concede in their brief that "the questions as to the accrual of the causes of action by individually-named plaintiffs may still need to be clarified at this time. . . ." Woodbridge Defendants Moving Br. at 39. Accordingly, the Woodbridge defendants have limited their statute of limitations argument to plaintiff PBA Local No. 38.

■ No defendant has shown that plaintiffs knew as of the time of the investigation that their, or indeed any, conversations had been recorded; indeed, the press reports on which defendants place substantial reliance are contradictory as to whether surveillance had or had not been occurring. Additionally, while plaintiffs apparently knew of the existence of the State Police report prior to August, 1987, knowledge of the existence of that report and knowledge of the report's contents are far different matters. Although defendants maintain that plaintiffs could have known the contents of the report prior to August, 1987 with the exercise of reasonable diligence (and therefore should have known), the court cannot say as a matter of law that this is so.[4]

The Woodbridge defendants rest their argument on another piece of evidence. Specifically, they claim that the minutes of the August 14, 1985 meeting of PBA Local No. 38 establish actual knowledge that wiretapping was occurring. This argument, too, must fail. Although the minutes of this meeting (certain portions of which were ordered redacted during discovery on the basis of attorney-client privilege) clearly mention the "bugging" of police headquarters, the statements therein do not establish that the PBA or any other plaintiff knew or should have known of their purported injury and the causal connection to defendants. In short, although defendants may ultimately prevail on the statute of limitations issue, that issue must be addressed to the jury.[5]

## B. Plaintiffs' Reasonable Expectation of Privacy

The threshold issue of statute of limitations aside, one of the primary themes of defendants' motions for summary judgment as they relate to intercepted telephone conversations is that plaintiffs cannot produce evidence to show that any conversations in which plaintiffs enjoyed a reasonable expectation of privacy were intercepted.

### 1. Conversations on "Beeped" Phone Lines

■ Defendants move for summary judgment on plaintiffs' claims insofar as they relate to the interception of conversations on the station house's "beeped" phone lines. Defendants concede for purposes of the motions that all telephone calls going into or coming out of the station house were taped on the Dictaphone machine in the basement. All but two of the phone lines in the station house were trunk lines subject to recording. Recording was signified by a beep every five seconds which was audible to the telephone's user. The deposition testimony of each and every individual plaintiff indicates that all were aware that the beeped lines were recorded.[6] Some plaintiffs indicated that they were told by department officials that the

---

4. Aside from the failure to address the knowledge of each individual plaintiff, the statute of limitations question is otherwise not ripe for summary judgment. As the court has previously opined, factual questions related to a plaintiff's state of mind are ordinarily for a jury to determine. *See Cowgill v. Raymark Industries, Inc.*, 780 F.2d 324, 329–331 (3d Cir.1985). Thus, in order to prevail on their statute of limitations arguments, defendants must show that there is no genuine factual dispute that plaintiffs' causes of action accrued prior to August, 1987. Under federal law, a cause of action is deemed to accrue when a potential plaintiff is aware, or should be aware, of the existence of the injury and the source of the injury. *Keystone Ins. Co. v. Houghton*, 863 F.2d 1125, 1127 (3d Cir.1988). New Jersey law is in accord. *See Viviano v. CBS, Inc.*, 101 N.J. 538, 546, 503 A.2d 296 (1986) ("Ordinarily, a cause of action accrues when the plaintiff knows of his or her injuries and of facts sufficient to attribute those injuries to the fault of another.").

5. The motion for summary judgment of NJB, however, will for other reasons be granted. *See* Section III, I, *infra*.

6. Polhamus Dep., Galassi Mov.Br., Exh. R, at 88; Trainor Dep., Galassi Mov.Br., Exh. S, at 89–91; Bernat Dep., Galassi Mov.Br., Exh. I, at 38–40; Robert Barajas Dep., Galassi Mov.Br., Exh. H, at 304; Nier Dep., Galassi Mov.Br., Exh. J, at 87; Donnelly Dep., Galassi Mov.Br., Exh. K, at 107; Covino Dep., Galassi Mov.Br., Exh. L, at 116; Kirby Dep., Galassi Mov.Br., Exh. M, at 144; Conklin Dep., Galassi Mov.Br., Exh. N, at 48–49; Thomas Barajas Dep., Galassi Mov.Br., at 39–40; Matelski Dep., Galassi Mov.Br., Exh. U, at 73; Hodes Dep., O'Brien Mov.Br., Exh. A, at 42; Whitaker Dep., O'Brien Mov.Br., Exh. D, at 110; Festa Dep., O'Brien Mov.Br., Exh. F, at 52; Schreck Dep., O'Brien Mov.Br., Exh. G, at 148.

lines were recorded.[7] Moreover, the deposition testimony establishes that even if a particular plaintiff was not told by department officials, it was general knowledge among police officers that the beep on the phone lines signified that the lines were being recorded.[8] Consistent with this knowledge, some plaintiffs testified that they adjusted their telephone conversations to avoid discussing matters which they did not want recorded.[9]

Arguing that plaintiffs could not have had a reasonable expectation of privacy in talking on these beeped lines, defendants move for summary judgment on all claims as they relate to conversations over beeped telephone lines. While this argument is persuasive as to certain of plaintiffs' claims, it is not as to others. Because the standards governing plaintiffs' various claims differ, they will be considered *seriatim.*

■ The § 1983 claim in the First Count (and, derivatively, the § 1983 conspiracy claim of the Fourth Count), it was previously determined, will be governed by the law prevailing at the time of the alleged violation. *See* Letter Opinion, dated May 10, 1991 (denying plaintiffs' motion for reconsideration of denial of class certification) (hereinafter "Letter Opinion"). As the court's previous overview of the development of the constitutional law of privacy made clear, the law most favorable to plaintiffs is *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the case in which the Supreme Court first determined that the Fourth Amendment's protections apply where there is a "reasonable expectation of privacy." *See* Letter Opinion at 9–10 (discussing Fourth Amendment jurisprudence from *Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), and *Goldman v. United States,* 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), which employed a physical trespass approach to the right to privacy, to

*Katz).* Thus, for purposes of the summary judgment motions, the court will apply the *Katz* "reasonable expectation of privacy" formulation to determine if plaintiffs' constitutional claims regarding conversations which occurred over beeped telephone lines are legally viable.

■ It is clear that plaintiffs did not have a reasonable expectation of privacy in conversations which took place over the beeped telephone lines. The Supreme Court has described the "reasonable expectation of privacy" test endorsed in *Katz* as follows:

*Katz* posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of a challenged search? Second, is society willing to recognize that expectation as reasonable? See *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

*California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986). The first prong of this inquiry relates to the person's *subjective* intent, i.e. whether he or she actually had an expectation of privacy. The second prong is an *objective* component, i.e. whether that expectation was reasonable. It is clear beyond any doubt that because all the police officer plaintiffs knew that the beeped phone lines were recorded, they had no subjective expectation that conversations on those lines would be private, and there certainly is no evidence on this score. Moreover, even were the evidence not so conclusive on the subjective prong of *Katz,* ample evidence supports the conclusion that the significance of the beeps was common knowledge among the Woodbridge police officers and, thus, that any subjective expectation of privacy could not be reasonable. Summary judgment will, therefore, be granted in favor of defendants as to the § 1983 claims of all plaintiffs insofar as those claims rely on conversations occurring on beeped phone lines.

---

7. Polhamus Dep., Galassi Mov.Br., Exh. R, at 90; Trainor Dep., Galassi Mov.Br., Exh. S, at 90; Covino Dep., Galassi Mov.Br., Exh. L, at 116–17; Hodes Dep., O'Brien Mov.Br., Exh. A, at 42.

8. Polhamus Dep., Galassi Mov.Br., Exh. R, at 89; Trainor Dep., Galassi Mov.Br., Exh. S, at 91; Bernat Dep., Galassi Mov.Br., Exh. I, at 39.

9. Polhamus Dep., Galassi Mov.Br., Exh. R, at 90; Bernat Dep., Galassi Mov.Br., Exh. I, at 39–40; Whitaker Dep., O'Brien Dep., Exh. D, at 110.

Defendants likewise move for summary judgment on plaintiffs' federal and state anti-wiretap statutory claims on the basis that plaintiffs had no reasonable expectation of privacy in these conversations. As will become clear, however, defendants apparent assumption that the "reasonable expectation of privacy" standard governs these claims is incorrect. Both the federal and the state wiretap statutes cover the interception of two kinds of communications, "wire" and "oral." *See* 18 U.S.C. § 2511(1)(a); N.J.S.A. 2A:156A–2(a) & (b). Both statutes define "oral communication" to include "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation. . . ." 18 U.S.C. § 2510(1); N.J.S.A. 2A:156A–2(b).[10] Courts interpreting this language in light of the legislative history of the federal act have opined that the "expectation of privacy" language in the statute was intended to parallel the language and standard of *Katz*, making the "reasonable expectation of privacy" highly relevant to claimed interceptions of oral conversations. *See In re John Doe Trader Number One*, 894 F.2d 240, 242 (7th Cir. 1990) (citing S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112–2274); *United States v. Harrelson*, 754 F.2d 1153, 1170–71 (5th Cir. 1985). *But see Walker v. Darby*, 911 F.2d 1573, 1578–79 (11th Cir.1990) (distinguishing between the expectation of privacy and the expectation of noninterception); *Boddie v. American Broadcasting Cos.*, 731 F.2d 333, 338–39 & n. 4 (6th Cir.1984).

Of critical importance here, however, is that defendants have moved for summary judgment only as to the *telephone* conversations of plaintiffs. Telephone conversations fall under the definition of "wire communication" in both the federal and state acts.[11] *Shubert v. Metrophone, Inc.*, 898 F.2d 401, 404 (3d Cir.1990); *Briggs v. American Air Filter Co.*, 630 F.2d 414, 417 (5th Cir.1980); *United States v. Axselle*, 604 F.2d 1330, 1334 (10th Cir.1979); *In re Wire Communication*, 76 N.J. at 261, 386 A.2d 1295. As a comparison between the definitions of "oral communication" and "wire communication" elucidates, wire communications, unlike oral communications, are generally protected regardless of whether the person making or receiving such communications has an expectation of privacy. *Compare* 18 U.S.C. § 2510(1) *with* 18 U.S.C. § 2510(2) *and* N.J.S.A. 2A:156A–2(a) *with* N.J.S.A. 2A:156A–2(b). *See Briggs*, 630 F.2d at 417 & n. 4. Plaintiffs' reasonable expectation of privacy being irrelevant to statutory liability for the alleged interception of wire communications, defendants' motion for summary judgment on these claims as they relate to conversations on beeped—or for that matter any—telephone lines on the basis that plaintiffs had no expectation of privacy in such conversations must be denied.

## 2. Conversations on Non–Beeped Phone Lines

Defendants' arguments in support of their motions for summary judgment on plaintiffs' claims arising out of the alleged interception of conversations on "unbeeped" phone lines

**10.** As similarities between the two statutes indicate, the state act was modeled after the federal act. *See In re Wire Communication*, 76 N.J. 255, 262, 386 A.2d 1295 (1978).

**11.** The federal act defines "wire communication" as

any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications for communications affecting interstate or foreign commerce and

such term includes any electronic storage of such communication, but such term does not include the radio portion of a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit. . . .

18 U.S.C. § 2510(1). Similarly, the New Jersey Wiretap Act defines "wire communication" as

any communication made in whole or in part through the use of facilities for the transmission of communications by wire, cable or other like connection between the point of origin and the point of reception furnished or operated by a telephone, telegraph or radio company for hire as a communication common carrier. . . .

N.J.S.A. 2A:156A–2(a).

do not, understandably, focus on the lack of an expectation of privacy. Rather, defendants attack these claims only as to certain plaintiffs on the basis that the claims lack factual support. Defendants argue that the evidence indicates that some plaintiffs never used the unbeeped phone lines and that, therefore, they could not have had any conversations on these lines intercepted. Certain plaintiffs have testified that they never had occasion to use such phone lines. *See* Polhamus Dep., Galassi Mov.Br., Exh. R, at 89, 95; Trainor Dep., Galassi Mov.Br., Exh. S, at 89; Hodes Dep., O'Brien Mov.Br., Exh. B, at 41; Festa Dep., O'Brien Mov.Br., Exh. F, at 50; Schreck Dep., O'Brien Mov.Br., Exh. H, at 156–57.[12] These plaintiffs, by their own admission, have no provable claims arising from conversations on unbeeped phone lines. Accordingly, defendants' motion for summary judgment will be granted as to the claims of plaintiffs Polhamus, Trainor, Hodes, Festa, and Schreck which rely on such conversations.

## C. Plaintiffs' State Constitutional and Common Law Claims

■ The Fifth Count of the complaint alleges that defendants violated plaintiffs' right to privacy as guaranteed by the Constitution of the State of New Jersey. The Sixth Count alleges the tort of "intrusion upon seclusion." Defendants move for summary judgment as to these claims based on certain limitations imposed by the New Jersey Tort Claims Act ("NJTCA"), N.J.S.A. 59:1–1 *et seq.* None of the parties disputes that the strictures of the NJTCA apply to plaintiffs' state constitutional and common law claims against the public entity and public employee defendants, i.e. all defendants except NJB.[13] Defendants argue that plaintiffs' claims for emotional distress, emotional anguish, and pain and suffering should be dismissed under N.J.S.A. 59:9–2(d), a section of the NJTCA limiting the types of judgments which can be

recovered from public entities and public employees for claims covered by the Act.

Under the NJTCA, damages may be recovered from a public entity or employee for pain and suffering only under certain circumstances. N.J.S.A. 59:9–2(d) provides:

No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000.00. For purposes of this section medical treatment expenses are defined as the reasonable value of services rendered for necessary surgical, medical and dental treatment of the claimant for such injury, sickness or disease, including prosthetic devices and ambulance, hospital or professional nursing service.

New Jersey courts have characterized the subjective symptoms accompanying emotional distress as within the definition of pain and suffering. *See Ayers v. Jackson*, 106 N.J. 557, 576–77, 525 A.2d 287 (1987). In order to recover for pain and suffering, a plaintiff must show both a permanent loss of a bodily function or permanent disfigurement or dismemberment and medical treatment expenses of more than $1,000. There is no dispute that plaintiffs have failed to meet both of these requirements. Recognizing this failure, plaintiffs do not oppose defendants' motion for summary judgment as to emotional distress, emotional anguish, and pain and suffering under state and common law. *See* Pl.Opp.Br. at 34.

■ Lest there be any confusion concerning the effect of this concession (and, even without concession, the undeniable failure to comply with N.J.S.A. 59:9–2(d)), the court will take this opportunity to state what should be obvious. The Fifth and Sixth Counts of the third amended complaint allege

---

12. Although defendant O'Brien attempts to place plaintiff Whitaker in this category, Whitaker's deposition testimony is not conclusive as to whether he ever used the unbeeped phone lines. *See* Whitaker Dep., O'Brien Mov.Br., Exh. D, at 114.

13. The Fifth and Sixth Counts of the third amended complaint will be dismissed as to defendant NJB on different grounds. *See infra* note 22.

that as a result of defendants' violations of plaintiffs' right of privacy under the New Jersey Constitution and defendants' "intrusion upon seclusion", plaintiffs suffered and continue to suffer humiliation, mental pain and anguish. Inasmuch as all these "injuries" fall within the purview of pain and suffering, the failure to comply with N.J.S.A. 59:9–2(d) mandates dismissal of the Fifth and Sixth Counts of the third amended complaint in their entirety as against the public defendants. *See Mercado v. State,* 212 N.J.Super. 487, 494, 515 A.2d 804 (Law Div.1985) (where plaintiff alleged injuries of severe emotional distress, distress, anxiety, and embarrassment and failed to comply with N.J.S.A. 59:9–2(d), the court found "no basis for recovery for these alleged injuries under the Tort Claims Act.").

### D. Interception of Plaintiff Schreck's Conversations

■ Defendant Galassi, joined by defendants O'Brien, Zirpolo, and NJB, moves for summary judgment on plaintiff Schreck's claims arising from the recording of conversations of Schreck which took place on December 20 and 21, 1987 in the communications room. There is no doubt that Schreck's conversations were recorded. Rather, defendants move for summary judgment because, they contend, there is no evidence to show that defendants were in any way responsible for the recording of these conversations or that the recording was intentional or willful, a prerequisite for liability under § 1983 and the federal and state wiretap statutes.

Schreck claims that the conversations were intercepted by a speaker in the communications room which, because of the way in which it was wired, acted as a microphone enabling recordation on the Dictaphone recorder in the basement of police headquarters. In support of this theory, plaintiffs rely on the expert report of Kevin D. Murray. Murray's report concludes in relevant part:

Further tests revealed that the [radio] room audio was being picked up by the radio's loudspeaker, which is located within three feet of where the central dispatcher sits. When the radio was not actively receiving communications (a majority of the time) the sound within the dispatcher's room was being picked up by the speaker, and carried to the tape recorder via the connecting cable.

Note: The average loudspeaker will act as a dynamic microphone when it is not in use as a speaker. This is a commonly known fact among electronic technicians.

Murray Report, Final Pretrial Order, Exh. A, at 4. Murray testified at his deposition that while the speaker in the radio room was an ordinary part of the radio transceiver, one of the channels was hooked up in an unusual way which allowed the ambient noise in the radio room to be recorded on the Dictaphone recorder in the basement. Murray Dep., Final Pretrial Order, Exh. C, at 42, 44.

Galassi points out that at his deposition, Murray did not know when the system or the speaker had been installed, who had wired the system in this way, or if it had been changed at any time. Murray Dep. at 43–44. Moreover, Galassi argues that because Schreck's conversations which were recorded in this way occurred in December, 1987, approximately four years after Galassi stepped down as Director, no reasonable inference can be drawn that he had any connection to these recordings.

Plaintiffs rejoinder cites a portion of the State Police report indicating that the communications system was renovated in late 1982 or early 1983, at which time Galassi was serving as Director. The report states that the renovation included replacing old equipment and modernizing the communications room. Certification of Francis A. Polito, dated October 29, 1990, Exh. C, at 00043. Murray also testified that in the 15 or 20 times in the past that he has seen speakers hooked up to act as microphones to pick up ambient sound, the hookup has never been by simple mistake. Murray Dep. at 63.

Defendants Galassi, O'Brien, Zirpolo, and NJB contend that the foregoing evidence is insufficient for a jury to reasonably infer that the recording of Schreck's conversations in the radio room was attributable to them. While the evidence is admittedly weak, the court cannot say that, viewing all reasonable inferences in favor of plaintiffs, there is no

genuine issue of material fact with respect to the recording of Schreck's conversations in the radio room. Accordingly, summary judgment will be denied as to these claims.

### E. The Claims of Plaintiff PBA Local No. 38

■ In its previous opinion, the court expressly declined to address the ability of PBA Local No. 38 to sue on behalf of its members. *PBA Local No. 38,* 134 F.R.D. at 101. Defendant Galassi, joined by defendant Zirpolo, now moves to dismiss the claims of plaintiff PBA Local No. 38 for lack of standing or, in the alternative, for summary judgment based on a lack of evidence to support the claims. Discovery having closed, plaintiff PBA's claim is essentially this: Galassi and the other defendants had the capability of intercepting conversations that took place at police headquarters for several years and many conversations concerning PBA union matters, including discussions concerning contract negotiations and negotiation strategy, took place at police headquarters, including the locker room and the muster room. From this, plaintiffs extrapolate that the Township of Woodbridge gained an unfair advantage over the PBA in contract negotiations and other matters.

Plaintiffs' protestations notwithstanding, it is clear under the standards previously enunciated by the court that PBA does not have standing to pursue its claims. After the benefit of full discovery, PBA finds itself in a situation much like that of the former-plaintiff officers whose claims were dismissed in the court's previous opinion. Thus, it asserts the existence of electronic surveillance capability generally and suspects that conversations related to PBA activity were intercepted. There is no evidence, however, which indicates that any conversations related to PBA activity were intercepted. Moreover, neither of PBA's designated representatives produced for depositions could identify any specific injury to the PBA that might have come from allegedly intercepted conversations. Schreck Dep., Galassi Mov.Br., Exh. F, at 58–62, 67; Protz Dep., Galassi Mov.Br.,

Exh. G, at 43–44, 48, 50. As the court has already ruled, "Where there has been no interception, there can have been no injury." *PBA Local No. 38,* 134 F.R.D. at 101. Therefore, the claims of plaintiff PBA Local No. 38 will be dismissed.

■ It is worthwhile noting that even were the court to somehow find that the PBA had standing to bring these claims, the utter failure to produce any evidence of intercepted conversations relating to PBA activity or any evidence of injury to the PBA would require that defendants' alternative motion for summary judgment on PBA's claims be granted. In the face of defendants' properly supported motion for summary judgment, plaintiffs have failed to go beyond the general and unsupported allegations of the third amended complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Based on the evidence of record, no reasonable jury could find in favor of plaintiff PBA. Accordingly, even if PBA had standing to bring this action, summary judgment would be granted in favor of defendants on all of PBA's claims. *See id.; Matsushita Elec. Industrial Prods. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) (party resisting a properly supported motion for summary judgment must do "more than simply show that there is some metaphysical doubt as to the material facts.").

### F. The Woodbridge Defendants' Arguments [14]

#### 1. Claims under the Federal and State Wiretap Statutes

■ The Woodbridge defendants contend that plaintiffs' claims under the federal and state anti-wiretap statutes should be dismissed as to them because the township and the police department are not "persons" as defined under those acts. The New Jersey Wiretapping and Electronic Surveillance Control Act provides for a civil cause of action "against any *person* who intercepts, discloses, or uses or procures any other person to intercept, disclose or use" a wire or

---

14. Plaintiffs do not oppose the Woodbridge defendants' motion for summary judgment insofar as plaintiffs seek punitive damages against the municipality and that motion will be granted.

oral communication, as defined by the Act. N.J.S.A. 2A:156A–24 (emphasis added). The Federal Wiretap Act provides that any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of the Act "can recover from the *person or entity* which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a) (emphasis added). The Woodbridge defendants' argument addresses the scope of coverage of the federal and state acts.

The Federal Wiretap Act defines "person" as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation...." 18 U.S.C. § 2510(6). The definitional section of the statute, the statute's legislative history, and the cases construing the meaning of "person" in this context make clear that while "person" includes government employees, it does not include governmental bodies themselves. *See* 18 U.S.C. § 2510(6); S.Rep. No. 1097, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2179 ("The definition [of person] explicitly includes any officer or employee of the United States or any State or political subdivision of a State ... Only the governmental units themselves are excluded."); *Spock v. United States,* 464 F.Supp. 510, 514 n. 4 (S.D.N.Y.1978) ("person" does not include the United States). Citing *Spock,* the Woodbridge defendants assert that they cannot be subject to liability under 18 U.S.C. § 2520.

■ Defendants' argument, however, fails to take into account the "or entity" language of § 2520(a). This language was added to the Act, effective in January, 1987, as part of the Electronic Communications Privacy Act of 1986, Pub.L. No. 99–508, 100 Stat. 1848 (1986). The amendment to § 2520(a) was recently construed in *Bodunde v. Parizek,* No. 93–C–1464, 1993 WL 189941, 1993 U.S.Dist. LEXIS 7365 (N.D.Ill. May 27, 1993) to specifically include governmental entities. *Id.* 1993 WL 189941 at *3, 1993 U.S.Dist. Lexis 7365 at *10–12. The *Bodunde* court reasoned that prior to the amendment of § 2520(a) in 1986, the definition of "person" in § 2510(6) already included business entities such as corporations and partnerships. Finding that both "person" and "entity" must be given effect in § 2520(a), the court held that "entity" referred to governmental entities. It found further support for this holding in the legislative history:

> [The Privacy Act of 1986] also added Chapter 121 of Title 18, 18 U.S.C. §§ 2701–10, which contains a provision for that chapter identical in relevant part to the language of § 2520(a). *See* 18 U.S.C. § 2707(a) ("Except as provided in § 2703(e), any provider of electronic communications service, subscriber, or customer aggrieved by any violation of this chapter in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind may, in a civil action, recover from the person or entity which engaged in that violation such relief as may be appropriate."). The Senate Committee Report summarized § 2707(a) as follows:

> Subsection (a) of this proposed section provides that, except as provided in section 2703(e), any provider of electronic communication service, subscriber, or customer of such service aggrieved by any violation of this new chapter may recover from any person or entity—*including government entities* —who knowingly or intentionally violated this chapter.

> S.Rep. No. 541, 99th Cong., 2d Sess. 43 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3597 (emphasis added).

*Bodunde, supra,* 1993 WL 189941 at *3–4, 1993 U.S.Dist. Lexis 7365 at *12. This reasoning is persuasive. Principles of statutory construction and the legislative history of the Electronic Communications Privacy Act of 1986 indicate that governmental entities such as the Woodbridge defendants can be subject to liability under § 2520(a). Therefore, the Woodbridge defendants' motion to dismiss the Federal Wiretap Act claims will be denied.

■ The definitional section of the New Jersey Wiretap Act states the following with respect to the word "person" as used in the Act: " 'Person' means that term as defined in

R.S. 1:1–2 and includes any officer or employee of the State or of a political subdivision thereof...." N.J.S.A. 2A:156A–2(e) (footnote omitted). As a footnote in the statute indicates, R.S. 1:1–2 is codified at N.J.S.A. 1:1–2, which states that "person"

> includes corporations, companies, associations, societies, firms, partnerships and joint stock companies as well as individuals, unless restricted by the context to an individual as distinguished from a corporate entity or specifically restricted to 1 or some of the above enumerated synonyms and, when used to designate the owner of property which may be the subject of an offense, includes this State, the United States, any other State of the United States as defined infra and any foreign country or government lawfully owning or possessing property within this State.

The Woodbridge defendants argue that because N.J.S.A. 1:1–2 also has separate definitions for "municipalities" and "municipal corporations," the term "person" should not be read to include municipalities. *See Leonard v. State Highway Dep't,* 29 N.J.Super. 188, 196, 102 A.2d 97 (App.Div.1954) (holding that "person" as defined in N.J.S.A. 1:1–2 does not include the State based on the fact that (1) the definition of "person" indicates that such term includes the State when it is used "to designate the owner of property which may be the subject of an offense;" and (2) "State" and "municipality" are separately defined in N.J.S.A. 1:1–2). Plaintiffs counter by citing *Hartman v. City of Brigantine,* 42 N.J.Super. 247, 126 A.2d 224 (App.Div.1956), *aff'd,* 23 N.J. 530, 129 A.2d 876 (1957). The court in *Hartman* construed New Jersey's wrongful death law, which made reference to "persons" as potential tortfeasors, to include counties. *Id.* at 255. The court reasoned that because the definition of "person" in N.J.S.A. 1:1–2 includes corporations, and because counties are municipal corporations specifically declared in the *Revised Statutes* of 1937 (40:18–1) to be bodies corporate, there is no reason to interpret "person" to include private corporations but not public corporations. *Id.* In reaching this conclusion, the court also relied on the fact that prior to the revision of the general laws in 1937, which revision is presumptively treated

as effecting no change in the substance of the laws, public corporations could be subjected to liability under the wrongful death law. Finding no intent to change the prior state of the law with respect to the liability of public corporations for wrongful death, the court concluded that "person" should be read to include municipal corporations. *Id.* This court finds these cases and the principles on which they are based inconclusive as they relate to the question *sub judice.*

■ As the *Hartman* court noted, "[t]he legislative intention is sometimes gathered with greater acuity 'from the spirit and policy of the statute rather than the literal sense of the particular terms.'" *Hartman,* 42 N.J.Super. at 255 (quoting *Lloyd v. Vermeulen,* 22 N.J. 200, 125 A.2d 393 (1956)). In determining what construction to give to the New Jersey Wiretap Act, the court must weigh the fact that the Act was closely modeled after and made to substantially parallel the Federal Wiretap Act. *See State v. Minter,* 116 N.J. 269, 275, 561 A.2d 570 (1989); *State v. Sanchez,* 149 N.J.Super. 381, 394, 373 A.2d 1028 (Law Div.1977). The New Jersey Wiretap Act's legislative history evidences the legislature's reliance on the Federal Wiretap Act. The sponsor's statement in the report on Senate Bill 897 states, "This bill is designed to meet the federal requirements and to conform to the Federal Act in terminology, style and format which will have obvious advantages in its future application and construction." Report on Senate Bill 897, Senate Committee on Law, Public Safety and Defense, October 29, 1968, at 21.

As the discussion of the Federal Wiretap Act, *supra,* makes clear, the federal Act did not include governmental bodies when it was originally passed and it was not until the word "entity" was added to § 2520(a) as part of the Privacy Act that governmental entities could be held liable for violations of the Act. In light of the New Jersey legislature's intent to adhere to the federal Act's terminology, it must be assumed that the New Jersey Act was not intended to include governmental bodies when it was enacted. Moreover, unlike its federal counterpart, the New Jersey Act has not been amended in a way

which could be viewed as subjecting municipalities to liability. Thus, this court construes the word "person" in N.J.S.A. 2A:156A–2(e) in accord with the definition of "person" in the Federal Wiretap Act, which definition does not include governmental bodies. Therefore, the Woodbridge defendants cannot be subjected to liability under the New Jersey Act and their motion to dismiss the Second Count will be granted.

### 2. § 1983 Claims

With respect to plaintiffs' claims under 42 U.S.C. § 1983, the Woodbridge defendants make three arguments. First, they argue that the federal and state wiretap statutes provide comprehensive remedies for claims arising out of alleged illegal surveillance and that, as a result, § 1983 liability should be deemed precluded. Second, they contend that the Woodbridge Police Department is not a "person" subject to liability under § 1983. Finally, they move for summary judgment as to the § 1983 claims on the ground there is no evidence to suggest that any alleged surveillance was undertaken pursuant to an official policy or custom.

#### (a) Statutory Preclusion of § 1983 Remedies

▮ The court need not tarry long on the Woodbridge defendants' claim that § 1983 liability should be precluded because the federal and state wiretap statutes provide comprehensive remedies for the alleged illegal surveillance. Plaintiffs' § 1983 claims are based on alleged violations of rights secured by the First, Fourth, Ninth, and Fourteenth Amendments. Third Amended Complaint ¶ 265. In arguing that there should be no § 1983 cause of action to enforce these rights, defendants rely on *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981). The Court stated in *Sea Clammers* that there are "two

exceptions to the application of § 1983 to *statutory violations*. In *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), we remanded certain claims for a determination of (i) whether Congress had foreclosed private enforcement of that statute in the enactment itself, and (ii) whether the statute at issue there was the kind that created enforceable 'rights' under § 1983." *Sea Clammers*, 453 U.S. at 19, 101 S.Ct. at 2626 (emphasis added). The fundamental flaw in defendants' argument is that the doctrine enunciated in *Pennhurst* and *Sea Clammers* pertains only to claims brought under § 1983 to enforce rights created by congressional *statutes*. *See Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 508, 110 S.Ct. 2510, 2516, 110 L.Ed.2d 455 (1990). Here, however, plaintiffs' § 1983 claims relate to rights which exist under the Constitution itself. Defendants' argument under *Pennhurst* and *Sea Clammers*, therefore, is simply inapt.[15]

#### (b) The Police Department is not a "Person" for Purposes of § 1983 Liability

▮ The Woodbridge defendants next contend that the Woodbridge Police Department is not a "person" under § 1983 and that, therefore, plaintiffs' § 1983 claims must be dismissed as to it. Defendants are correct. The numerous courts that have considered the question of whether a municipal police department is a proper defendant in a § 1983 action have unanimously reached the conclusion that it is not. *Martinez v. Winner*, 771 F.2d 424, 444 (10th Cir.1985); *Moran v. Illinois State Police*, No. 93–C–1554, 1993 WL 210107, at 1–2, U.S.Dist. LEXIS 7950, at 7–8 (N.D.Ill. June 11, 1993); *Creppel v. Miller*, No. 92–2531, 1993 WL 21408, at 1, U.S.Dist. LEXIS 792, at 1 (E.D.La. January 22, 1993); *Timberlake v. Benton*, 786 F.Supp. 676, 682 (M.D.Tenn.1992); *Vanderlinde v. Brockman*, No. 92–C–836, 1992 WL 26737, at

---

15. Punctuating this self-evident point are the multitude of cases in which § 1983 claims based on alleged Fourth Amendment violations are brought together with claims under the Federal Wiretap Act. *See, e.g., Newcomb v. Ingle*, 944 F.2d 1534, 1535 (10th Cir.1991), *cert. denied*, ––– U.S. –––, 112 S.Ct. 903, 116 L.Ed.2d 804 (1992);

*Hatfield v. Hayes*, 877 F.2d 717, 718 (8th Cir. 1989); *Scutieri v. Paige*, 808 F.2d 785, 787 (11th Cir.1987); *Pavlak v. Church*, 727 F.2d 1425, 1426 (9th Cir.1984); *Bodunde*, No. 93–C–1464, 1993 WL 189941, 1993 U.S.Dist. LEXIS 7365 (N.D.Ill. May 27, 1993).

*1, U.S.Dist. LEXIS 1315, at *2 (N.D.Ill. February 5, 1992); *Stump v. Gates,* 777 F.Supp. 808, 815 (D.Colo.1991), *aff'd,* 986 F.2d 1429 (10th Cir.1993); *Eddy v. City of Miami,* 715 F.Supp. 1553, 1556 (S.D.Fla. 1989); *Reese v. Chicago Police Dep't,* 602 F.Supp. 441, 443 (N.D.Ill.1984); *Shelby v. City of Atlanta,* 578 F.Supp. 1368, 1370 (N.D.Ga.1984). Accordingly, plaintiffs' § 1983 claims will be dismissed as to the Woodbridge Police Department.[16]

### (c) The Actions Alleged Were not Taken Pursuant to Municipal Policy, Custom, or Usage

█ The final argument raised by the Woodbridge defendants with respect to plaintiffs' § 1983 claims is the most substantial, i.e. there is no evidence which indicates that the alleged surveillance on the part of defendant Galassi or the other defendants was done pursuant to official policy, custom, or usage, a predicate to municipal liability under *Monell v. Dep't of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). The Supreme Court in *Monell* rejected the theory of § 1983 municipal liability by virtue of the application of the doctrine of *respondeat superior:*

> We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694, 98 S.Ct. at 2037–38. Key to determining whether a municipality can be held liable under § 1983, then, is whether the injury complained of, here, invasion of privacy, resulted from "official policy" or "custom or usage."

█ The Court set out to clarify the meaning of "policy" in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986).

Recognizing that a single act of municipal policymakers can give rise to § 1983 liability, the Court held that decisions by officials with "final authority to establish municipal policy with respect to the action ordered" will be deemed policy. *Id.* at 481, 106 S.Ct. at 1299. Authority to make municipal policy may be granted by legislative enactment or delegated by those who possess such authority, and whether an official has policymaking authority is a question of state law. *Id.* at 483, 106 S.Ct. at 1300; *City of St. Louis v. Praprotnik,* 485 U.S. 112, 124, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). Municipal custom, on the other hand, will arise where a course of conduct, though not formally approved through official channels, is so permanent and well settled as to virtually constitute law. *Monell,* 436 U.S. at 690–91, 98 S.Ct. at 2035–36 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970)); *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1481 (3d Cir. 1990). Whether a plaintiff asserts municipal liability by way of policy or custom, "it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." *Andrews,* 895 F.2d at 1480 (citing *Jett v. Dallas Independent School District,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989)).

█ The existence of municipal policymaking authority is a legal question to be resolved by the court. *Jett,* 491 U.S. at 737, 109 S.Ct. at 2723; *Praprotnik,* 485 U.S. at 126, 108 S.Ct. at 925. Policymaking authority will be held to exist where there is "final, unreviewable discretion to make a decision or take an action." *Andrews,* 895 F.2d at 1481; *see also Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926; *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir.1990). Once the court has determined where policymaking authority lies, it is for the jury to decide whether the decisions of those with policymaking authority have caused the deprivation at issue. *Jett,* 491 U.S. at 737, 109 S.Ct. at 2723; *Andrews,* 895 F.2d at 1481. The Supreme Court in

---

**16.** Despite the dismissal of plaintiffs' § 1983 claims as against the Woodbridge Police Department, for the sake of convenience, the court will continue to refer to the "Woodbridge defendants" even in the context of § 1983 claims.

*Jett* made explicit the distinction between legal and factual questions:

> Reviewing the relevant legal materials, including state and local positive law, as well as " 'custom or usage' having the force of law," ... the trial judge must identify those officials or government bodies who speak with final policymaking authority for the local government actor concerning the action alleged to have caused the particular violation at issue. Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur ... or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity.

*Jett*, 491 U.S. at 737, 109 S.Ct. at 2723 (emphasis in original).[17]

■ Thus, the first question before the court is whether under state and local law defendant Galassi, who plaintiffs allege installed and used surveillance equipment, had policymaking authority with respect to such acts. If this inquiry yields an affirmative answer, the court must then determine if there is a genuine issue of material fact as to whether Galassi's decision to "bug" the phone lines and various areas of the police station caused the deprivation of plaintiffs' privacy rights by policy or custom.

■ To determine if Galassi, as Director of Police, had policymaking authority to carry on the alleged surveillance of plaintiffs, the court must determine whether local law vests final, unreviewable discretion for this decision in the Director of Police. The parties do not dispute that Galassi was, to some extent at least, a policymaking official. The Woodbridge ordinance establishing the De-

partment of Police and the position of Director of Public Safety[18] specifically sets forth the duties of the Director:

> The Director of Public Safety shall be responsible for the promulgation of and/or amendments to the Rules and Regulations of the Department of Police, as provided in N.J.S.A. 40A:14–118; shall be the hearing officer for any and all disciplinary actions involving employees of the Department of Public Safety; exercise his or her authority through policy decisions and the formulation of fundamental principles to serve as guidelines to the Chief of Police with respect to the routine day-to-day operations of the Police Department; supervise the operations of Emergency Management; act as a liaison between the respective fire districts within the township; prepare and submit yearly budget requests, after consultation with the Chief of Police, to the Budget Director; report to the Mayor and the Municipal Council from time to time; promulgate Rules and Regulations for the Auxiliary Police; act as liaison with all First Aid Squads within the township; and ensure the proper operation of his department on a daily basis.

Revised Ordinances of Woodbridge, Art. 11, § 2–86 (January 21, 1964) (originally Ordinance No. 90–25, Art. 10, § 10.3), Rudin September 25, 1992 Cert., Exh. A.

There can be no doubt that the Director had policymaking authority in a number of areas. The Director's duties clearly contemplate that he or she will make policy decisions and formulate fundamental principles to guide the Chief of Police in running the day-to-day operations of the department. Thus, with respect to the general operation of the department, the Director has final, unreviewable policymaking authority. The more specific question before the court, however, is whether the duties enumerated above

---

**17.** Of course, in order to impose liability on a municipality, a plaintiff must also ultimately demonstrate a "plausible nexus" of causation between the unlawful policy or custom and the injuries suffered. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985); *Bielevicz*, 915 F.2d at 850. The Woodbridge defendants do not challenge plaintiffs' ability to show causation.

**18.** Although the ordinance describes the position as "Director of Public Safety", the parties have referred to the position as "Police Director". In any event, there is no dispute that by whichever appellation, Galassi held the position.

clothed Director Galassi with the policymaking authority to, as alleged, electronically intercept conversations of police officers at police headquarters. In the absence of contrary authority, the answer would be a resounding yes.

■ The Woodbridge defendants, however, argue that the Director did not enjoy final, unreviewable policymaking authority with respect to approving wiretaps. As support for this proposition, they cite General Order No. 39 of the Woodbridge Police Department. General Order No. 39, Certification of Philip J. DiNicola, dated January 29, 1993, Exh. A. General Order No. 39, directed to all personnel from the Office of the Chief of Police and dated October 13, 1975, addresses "Wire Tap Laws on Consensual Interceptions." The order cites recent changes to the New Jersey Wiretapping and Electronic Surveillance and Control Act, specifically N.J.S.A. 2A:156A–4(b) and (c), which require that a county prosecutor authorize "most types of consensual interceptions." The order then states that "As a general rule, whenever a law enforcement officer enlists the aid of a third party, be that third party a civilian or a fellow law enforcement officer, to intercept any criminal conversation, the approval of the County Prosecutor is necessary." The order then sets forth a procedure to be followed by members of the department before intercepting wire or oral communications: the member desiring to intercept a telephonic or oral communication would first make a request in writing to the Commanding Officer of the Criminal Investigation Section; the Commanding Officer would then request a conference with the Chief or Director, or his or her representative; if it was determined that all the requirements of the New Jersey statute were satisfied, the Director or Chief, or his or her designee, would call the county prosecutor and request an appointment with the prosecutor or his or her representative.

Although plaintiffs [19] attempt to argue that the policy embodied in General Order No. 39 has been "abandoned" because there is evidence that the intermediate steps of submitting a written request to the Commanding Officer of the Criminal Investigation Section and conferencing with the Director and Chief were not followed in practice, see DiNicola Dep., Galassi Suppl.Br., Exh. A, at 28–29; O'Brien Dep., Galassi Suppl.Br., Exh. D, at 6–7, there has been no suggestion that the ultimate step, and the main thrust of General Order No. 39, i.e. that approval be obtained from the county prosecutor, was not followed. General Order No. 39, therefore, cannot be said to have been "abandoned".

■ Based on General Order No. 39, the Woodbridge defendants contend that the Director did not have policymaking authority with respect to conducting wiretap surveillance, arguing that the authority for wiretapping rested instead with the county prosecutor. While appealing at first blush, this argument is flawed. General Order No. 39 was clearly intended to cover situations in which law enforcement officers sought to use wiretaps in the course of criminal investigations. The order requires county prosecutor approval prior to the interception of any "criminal conversation." The involvement of the Commanding Officer of the Criminal Investigation Section, and even of the county prosecutor, lends support to this view. Moreover, the section of the New Jersey statute with which General Order No. 39 strives to comply, N.J.S.A. 2A:156A–4(b) and (c), requires the county prosecutor to make a determination that there is a reasonable suspicion that evidence of criminal conduct will be gained from the interception. A sensible reading of General Order No. 39 is that its procedures are limited to wiretaps in criminal investigations. There is no suggestion in this record that the surveillance alleged here was to detect or investigate criminal activity on the part of Woodbridge police officers.

The Woodbridge ordinance outlining the Director's authority to set policy with respect to the operations of the Woodbridge Police Department must govern the use of wiretaps for purposes other than criminal investigations. For instance, if the department wished to monitor the telephone conversations of the person assigned to its public switchboard to ensure competent and courte-

---

**19.** Defendant Galassi joins plaintiffs in arguing in support of a finding of municipal policy.

ous assistance, the decision to do so would be an operational policy decision properly attributable to the Director. It would be nonsensical for anyone at the department to seek a determination from the county prosecutor as to whether such an interception would be likely to uncover evidence of criminal wrongdoing.

Moreover, it would be anomalous to suggest that the policymaker for the municipal police department is a *county* official. Municipal liability exists only where an unlawful action is taken by a municipal policymaker. *Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300. The Court's opinions in *Pembaur*, *Praprotnik*, and *Jett* recognize that a determination as to which official or officials have policymaking authority is crucial to resolving the question of municipal liability. To claim, as the Woodbridge defendants' claim, that the county prosecutor sets municipal policy for the Township of Woodbridge gives the lie to Justice O'Connor's statement that "we can be confident that state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *Praprotnik*, 485 U.S. at 125, 108 S.Ct. at 925.

This court concludes, based on the applicable state law, that the Director of Police, with final, unreviewable authority to set policy governing the operations of the Woodbridge Police Department, is a "policymaking official" for purposes of the challenged actions. Having identified the Director as the relevant policymaking official, the court finds that there is a factual issue as to whether Galassi's decisions or actions "caused the deprivation of rights at issue by policies which affirmatively command that it occur ... or by acquiescence in a longstanding practice or custom which constitutes 'standard operating procedure' of the local governmental entity." *Jett*, 491 U.S. at 737, 109 S.Ct. at 2723. Accordingly, the Woodbridge defendants' motion for summary judgment with respect to plaintiffs' § 1983 claims will be denied.

### 3. Crossclaims for Indemnification

The Woodbridge defendants assert that they are entitled to judgment as a matter of law on the crossclaims of their codefendants. They argue that the nature of the claims against all defendants requires a finding that, as a matter of law, the actions taken were not within the scope of their employment and that, under the authority of *Cosgrove v. Lawrence*, 214 N.J.Super. 670, 679, 520 A.2d 844 (Law Div.1986), these claims must be dismissed. The court disagrees. While the crossclaims may ultimately prove unavailing as a matter of law, that determination depends on the nature and extent of defendants' conduct, a factual question which must await trial.

A municipality cannot indemnify an employee for his or her acts where those acts were outside the scope of his or her employment or were criminal, fraudulent, malicious, or willful misconduct. N.J.S.A. 59:3–14; *Palmentieri v. Atlantic City*, 231 N.J.Super. 422, 431, 555 A.2d 752 (Law Div. 1988) (construing sections of the New Jersey Tort Claims Act, N.J.S.A. 59:10–4, 59:2–2, and 59:2–10 together). The determination as to whether an employee's acts were outside the scope of employment was considered in some depth in *Cosgrove*. The court there noted that New Jersey has adopted the formulation of scope of employment set forth in the Restatement (Second) of Agency. *Cosgrove*, 214 N.J.Super. at 674, 520 A.2d 844 (citing *Commercial Union Ins. Co. v. Burt Thomas–Aitken Constr. Co.*, 49 N.J. 389, 392 n. 1, 230 A.2d 498 (1967)). Relevant to this inquiry is whether the act is of the kind that an employee is employed to perform; whether it occurs within the authorized time and space limits; and whether it is actuated at least in part in an effort to serve the employer. *Cosgrove*, 214 N.J.Super. at 674, 520 A.2d 844 (quoting the Restatement); *see also DiCosala v. Kay*, 91 N.J. 159, 169, 450 A.2d 508 (1982). In determining that the scope of employment was a question for the jury, the court in *Marley v. Palmyra Borough*, 193 N.J.Super. 271, 295–96, 473 A.2d 554 (Law Div.1983), relied on Professor Prosser's statement that scope of employment refers to "those acts which are so closely connected

with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." *Id.* at 296, 473 A.2d 554 (quoting Prosser, *Handbook of the Law of Torts* (4th ed. 1971), § 70 at 460–61). In *Cosgrove,* on the other hand, the court held that a social worker-therapist's sexual relationship with a patient over a fifteen month period was not within the scope of employment as a matter of law. After considering those factors enumerated in *Palmentieri, Cosgrove,* and *Marley,* this court is unable to hold as a matter of law that the public employees' acts were outside the scope of their employment.

 Even where acts are within the scope of employment, a municipality will not indemnify its employee where the acts constitute "willful misconduct." The *Marley* court defined willful misconduct as "the commission of a forbidden act with actual (not imputed) knowledge that the act is forbidden." *Marley,* 193 N.J.Super. at 294–95, 473 A.2d 554. The court held that it requires more than an absence of good faith and "much more" than negligence. *Id.* at 295, 473 A.2d 554. This court finds that whether the public employees' acts were "willful misconduct" is a question of fact which is not ripe for summary judgment. Accordingly, the Woodbridge defendants' motion for summary judgment as to all codefendants' crossclaims will be denied.

### G. Defendant O'Brien's Motion for Summary Judgment for the Years 1964 Through 1984

 Defendant O'Brien moves for summary judgment with respect to activities which took place between 1964 and 1984. O'Brien maintains that plaintiffs have no evidence from which a reasonable jury could conclude that he engaged in any activity which could be considered violative of the constitutional, statutory, and common law rights asserted by plaintiffs. O'Brien served in the Woodbridge Police Department as a patrolman from 1957 until 1962, as a Sergeant in the Operations & Planning Division from 1962 through 1967, and as a Lieutenant in the Operations & Planning Division from 1967 to 1969. He became a Captain in 1969 and was named Chief of Police in 1974. He served in this capacity until 1984, when he was named Police Director upon Galassi's retirement. Stip. ¶¶ 8–15.

In an effort to defeat O'Brien's motion for partial summary judgment, plaintiffs point to various portions of his deposition testimony which, they claim, give rise to an inference that O'Brien had some involvement in eavesdropping prior to 1984. What plaintiffs characterize as "wildly contradictory" deposition testimony, however, is nothing more than testimony which is only unclear when given plaintiffs' shaded meanings and which, even granting every conceivable favorable inference to plaintiffs, could not give rise to liability for O'Brien for the years prior to 1984.

Plaintiffs' strongest evidence in this regard is O'Brien's testimony regarding a toggle switch under the Director's desk which, he discovered when he was Chief of Police and acting Director, controlled the taping of conversations in the Director's office. O'Brien January 17, 1990 Dep., Francis Cert., Exh. A, at 66. Plaintiffs would have the court deny the motion for partial summary judgment because at one point in his deposition O'Brien testified that, upon discovering the switch, he turned it off and "that was the end of that," O'Brien September 22, 1988 Dep., Francis Cert., Exh. A, at 153, while at another point he testified that when the switch and its capability were discovered, he called Motorola, the company responsible for maintaining the police radio equipment, and they came in and replaced the toggle switch, which "shut the machine off." O'Brien January 17, 1990 Dep., Francis Cert., Exh. A, at 67. These two renditions of what O'Brien did upon discovering the recording capability in the Director's office, given at depositions fifteen months apart, are not materially inconsistent. In any event, even if they were inconsistent, they do not give rise to an inference which could support a jury verdict against O'Brien for conduct occurring prior to 1984. Because the other evidence cited by plaintiffs in opposition to the motion is similar, if not weaker, defendant O'Brien's motion for partial summary judgment for the

years from 1964 through 1984 will be granted.

### H. Defendant Zirpolo's Motion for Summary Judgment

Defendant Zirpolo also moves for summary judgment on all counts of the third amended complaint. As is O'Brien's motion for partial summary judgment, Zirpolo's motion is based on a lack of evidence against him. Zirpolo, now deceased, was the Mayor of the Township of Woodbridge from 1962 to 1967. It was during his term as Mayor that the police headquarters was built.

Plaintiffs contend that Zirpolo had knowledge of and approved of the installation and use of surveillance devices in the building. The evidence relied on by plaintiffs consists of the following: testimony from Galassi that he, Zirpolo, the Township's Business Administrator, and, perhaps, the architect, discussed the installation of microphones in the new police headquarters building, Galassi Dep., Francis Cert., Exh. H, at 71, and testimony from Zirpolo himself that he "apparently" approved the plans for the proposed headquarters. Zirpolo Dep., Francis Cert., Exh. I, at 18. Zirpolo denied having discussed surveillance devices with Galassi and denied any knowledge whatsoever of surveillance devices in police headquarters. Zirpolo Dep., Zirpolo Br., Exh. A, at 43–44.

While the evidence relied on by plaintiffs is weak, it nonetheless presents a factual issue which cannot be resolved on a motion for summary judgment. Because a jury could conclude based on Galassi's testimony that he and Zirpolo discussed the installation and use of surveillance devices in the headquarters building, Zirpolo's motion for summary judgment must be denied.[20]

### I. New Jersey Bell's Motion for Summary Judgment

Plaintiffs' claims against defendant NJB are related solely to allegations that telephone conversations were intercepted by use of the 20 button "call director" in the Director's office. NJB does not dispute that this equipment gave the Director "service observing" capability, i.e., the ability to monitor telephone calls without an audible indication to the parties to the conversation that the call is being observed. NJB makes several arguments in support of its motion for summary judgment. First, NJB argues that there is no evidence to support plaintiffs' claims that it violated the federal or state wiretap statutes.[21] NJB's argument in this regard is unclear. To the extent that it is argued that there is no evidence that any conversations were intercepted by use of the equipment supplied by NJB, that argument is rejected. Galassi's former secretary, Rita Hutnick, testified that she observed Galassi listen to phone conversations on as many as two dozen occasions. Hutnick Dep., Francis Cert., Exh. B, at 33–35.

On the other hand, NJB also seems to argue that there is no evidence that *it*, as opposed to the other defendants, willfully intercepted any conversations. Liability under both the federal and state acts may only be imposed upon a person who intercepts, discloses, or uses a wire or oral communication, or who procures another person to intercept, disclose, or use a wire or oral communication. 18 U.S.C. § 2520(a); N.J.S.A. 2A:156A–24. Plaintiffs do not allege disclosure or use of their communications; rather, their claims focus on the interception of their communications. NJB's arguments concerning willfulness aside, summary judgment in NJB's favor is appropriate because there is no evidence that NJB intercepted any wire or oral communication or procured any other person to intercept a wire or oral communication.

The Federal Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device". 18 U.S.C.

---

**20.** Defendant Zirpolo's motion for summary judgment on plaintiffs' punitive damages claim against him must likewise be denied. A determination as to the nature and extent of Zirpolo's misconduct, if any, must await trial.

**21.** As previously discussed, neither statute requires that there be a reasonable expectation of privacy for purposes of finding a violation. There is, therefore, no reason to differentiate between conversations on beeped and unbeeped telephone lines in discussing the statutory claims.

§ 2510(4). The New Jersey Act defines "intercept" as "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device". N.J.S.A. 2A:156A–2(c). All NJB did was install, and perhaps maintain or service, a "call director" in the Director's office. This does not amount to "interception" or procuring another to intercept. Parenthetically, plaintiffs' argument that NJB did not comply with New Jersey Board of Public Utilities regulations regarding service observing equipment is irrelevant if NJB has not intercepted or procured another to intercept wire or oral communications. Finding this essential element of the statutory causes of action missing, summary judgment will be granted in NJB's favor on the federal and state wiretap claims.

 Likewise, there is no evidence that NJB was part of a conspiracy to violate plaintiffs' constitutional rights. Assuming *arguendo* that plaintiffs can show sufficient "joint action" with the state to satisfy the state action requirement of § 1983,[22] plaintiffs have utterly failed to allege acts by NJB which violated plaintiffs' constitutional rights and have failed to uncover any evidence of participation by NJB in a conspiracy to violate their constitutional rights.[23] NJB is in a position substantially similar to that of defendant Dictaphone. Just as the court previously ruled in granting Dictaphone's motion for summary judgment because there was no

evidence from which it could reasonably be inferred that Dictaphone or its employees had "reached an understanding" with any of the other defendants or had otherwise done anything which could amount to an invasion of privacy, so, too, the court finds that NJB did nothing more than install, and perhaps maintain, a call director at the Woodbridge Police Department. *PBA Local No. 38 v. Woodbridge Police Department,* No. 89–3314 (MTB), 1991 WL 532494 (September 26, 1991) (Opinion and Order granting summary judgment in favor of defendant Dictaphone). This does not amount to a violation of plaintiffs' constitutional rights. Moreover, having had the benefit of discovery, plaintiffs have come forward with no evidence which suggests an agreement between NJB or its employees and anyone else. *See Strength v. Hubert,* 854 F.2d 421, 425 (11th Cir.1988) (to establish a *prima facie* case of a conspiracy under § 1983, plaintiff must show an *understanding* to violate constitutional rights); *Hammond v. Bales,* 843 F.2d 1320, 1323 (10th Cir.1988). As a result, plaintiffs' substantive and conspiracy claims against NJB under § 1983 must also be dismissed.[24] Stated more succinctly, NJB's is not a proper defendant in this action.

## IV. Plaintiffs' Motion to Amend the Complaint

 In addition to opposing defendants' motions for summary judgment, plaintiffs'

---

**22.** Recognizing that a private actor who has conspired with one or more state actors to violate a plaintiff's constitutional rights can be held liable under § 1983, *see Dennis v. Sparks,* 449 U.S. 24, 29, 101 S.Ct. 183, 187, 66 L.Ed.2d 185 (1980); *Hauptmann v. Wilentz,* 570 F.Supp. 351, 381 (D.N.J.1983), *aff'd,* 770 F.2d 1070 (3d Cir.1985), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1987), in the absence of a conspiracy plaintiffs would have to somehow show that NJB's conduct should be considered state action. Without passing on the question, the court expresses grave doubts as to plaintiffs' ability to bring their claims against NJB within any of the parameters under which a private actor's deeds are considered state action. *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (nexus test); *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (symbiotic relationship test); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (state compulsion test); *Rendell–Baker v. Kohn,*

457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (public function test).

**23.** Unlike a claim under 42 U.S.C. § 1985, which plaintiffs concede is not cognizable in this action, a conspiracy is not actually an element of a § 1983 claim. It is recognized, however, that civil conspiracy is a vehicle by which § 1983 liability may be imputed to those who have not actually performed the act denying constitutional rights. *Pfannstiel v. City of Marion,* 918 F.2d 1178, 1187 (5th Cir.1990). As a result of this distinction, a § 1983 conspiracy claim is not actionable without an actual violation of § 1983. *Id.; Dixon v. City of Lawton,* 898 F.2d 1443, 1449 (10th Cir.1990).

**24.** The court's finding that, as a matter of law, the conduct of NJB could not give rise to a finding that NJB violated plaintiffs' privacy rights also mandates summary judgment with respect to NJB on plaintiffs' state constitutional and common law invasion of privacy claims.

have cross-moved to file a fourth amended complaint which would add a claim of tortious concealment and spoliation of evidence. In the proposed fourth amended complaint, plaintiffs specifically allege that Galassi ordered and allowed tape recordings of their private conversations to be taped over and reused, that he removed electronic surveillance equipment from police headquarters, that he sold electronic equipment and tape recordings used in the alleged surveillance to a pawn shop, and that he shredded documents relating to the alleged surveillance. Plaintiffs further allege that defendants "knew or should have known" that litigation concerning the surveillance was probable and that the items destroyed were potential evidence. Moreover, plaintiffs claim that the destruction and concealment of evidence was designed to prevent them from successfully pursuing litigation and that it has, in fact, done that. *See* Proposed Fourth Amended Complaint ¶¶ 286–91.

■ Under the liberal amendment policy embodied in Fed.R.Civ.P. 15(a), leave to amend a complaint will be freely granted where justice so requires. Fed.R.Civ.P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). The court may deny leave to amend where there is delay in seeking such leave, which delay is undue, motivated by bad faith, or prejudicial to the opposing party. *Adams v. Gould, Inc.*, 739 F.2d 858, 864 (3d Cir.1984), *cert. denied*, 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (1985). Importantly, the court may also deny leave to amend where the amendment fails to state a cause of action and, therefore, amendment would be futile. *Jablonski v. Pan American World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir.1988); *Adams*, 739 F.2d at 864; *Massarsky v. General Motors Corp.*, 706 F.2d 111, 125 (3d Cir.), *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983); *Snyder v. Baumecker*, 708 F.Supp. 1451, 1459 (D.N.J.1989).

In seeking to bring a claim for concealment and spoliation of evidence, plaintiffs rely on *Viviano v. CBS, Inc.*, 251 N.J.Super. 113, 126, 597 A.2d 543 (App.Div.1991), *certif. denied*, 127 N.J. 565, 606 A.2d 375 (1992). In *Viviano*, the Appellate Division of the Superior Court of New Jersey apparently recognized the tort of spoliation of evidence for the first time.[25] *See Trump Taj Mahal Associates v. Costruzioni Aeronautiche Giovanni Agusta, S.p.A.*, 761 F.Supp. 1143, 1162 (D.N.J.1991) (noting that New Jersey courts had not yet recognized the tort of spoliation of evidence), *aff'd*, 958 F.2d 365 (3d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992). The court in *Viviano* set out the elements of the tort: "(1) pending or probable litigation involving the plaintiff; (2) knowledge on the part of the defendant that litigation exists or is probable; (3) willful or, possibly, negligent destruction of evidence by the defendant designed to disrupt the plaintiff's case; (4) disruption of the plaintiff's case; and (5) damages proximately caused by the defendant's acts." *Viviano*, 251 N.J.Super. at 126, 597 A.2d 543. Plaintiffs contend that if leave to amend is granted, all the evidence relevant to the proposed spoliation of evidence count has been gathered and that discovery would not need to be reopened. Thus, defendants correctly urge the court to view plaintiffs' proposed amendment not only under the standards of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), but also under the standards applicable to a motion for summary judgment pursuant to Fed.R.Civ.P. 56(c).

Plaintiffs brought their claims initially in state court in 1988 and, after a voluntary dismissal of the state court action, in this court in August of 1989. There have already been three amendments to the complaint in this court. The deposition of defendant Galassi upon which plaintiffs primarily rely in asserting their new cause of action was taken in December, 1988. Despite the fact that the factual and legal bases now asserted in sup-

---

**25.** It is not entirely clear from the Appellate Division's opinion in *Viviano* that New Jersey now recognizes the tort of spoliation of evidence. The court in *Viviano* was considering only the fraudulent concealment claim decided in plaintiff's favor by the jury. The court analogized to the tort of spoliation of evidence in passing upon defendants' arguments on appeal. For the purposes of plaintiffs' motion for leave to amend, however, the court will assume that this tort is recognized in New Jersey.

port of the motion for leave to amend were available to plaintiffs in October, 1991, when *Viviano* was decided, the motion was not filed until almost one year later, i.e. in late September, 1992. Plaintiffs' unexplained and inexcusable delay in seeking leave to amend in this already lengthy if not dragged out litigation could well be sufficient, without more, to deny the motion. Given the nature of the amendment sought, however, the court need not rest its denial of the motion on timeliness grounds.

It is apparent upon even a cursory view of the proposed additional count in light of the evidence which would purportedly support that claim that amendment of the complaint to add a claim for spoliation of evidence would be futile. As previously noted, plaintiffs' spoliation claim relies primarily on the deposition testimony of defendant Galassi. The acts of "spoliation" complained of by plaintiffs are Galassi's removal of electronics equipment from his office when he stepped down as Director of Police in 1983 or 1984, the sale of some of that equipment to a pawn shop operated by Dominick Malgeri, the admission by Galassi in the State Police report that all tape recordings he had made were either reused or eradicated, and the reuse of tapes in the Dictaphone recorder in the basement of police headquarters on a rotating basis every thirty days. All the actions complained of by plaintiffs occurred during or just after Galassi's term as Director of Police, i.e. in or before 1984.

The shortcoming in plaintiffs' proposed spoliation of evidence claim is obvious. There was no "evidence" destroyed here. At the time the acts complained of occurred, litigation was not pending but, rather, was four or five years away. Moreover, plaintiffs' allegation that defendants should have known in 1984 that litigation was probable is patently absurd. Additionally, the instant case is readily distinguishable from *Viviano,* in which defendants were found to have concealed a report they were obligated to turn over in discovery. *Viviano,* 251 N.J.Super. at 122, 597 A.2d 543. Here, whatever mountain of materials plaintiffs have not received is merely because Galassi cleaned out his office and sold electronic equipment he

owned to a pawn shop and because the tapes used in the Dictaphone recorder were reused and taped over on a regular basis. These actions could not, under any theory, amount to spoliation of evidence. Plaintiffs' motion for leave to file a fourth amended complaint will be denied.

## V. Conclusion

Given the numerous claims against each defendant and the various arguments made with respect to each claim and each defendant, the court will summarize its holdings. By means of this motion, certain parties have been eliminated from this litigation entirely. As to defendants, the summary judgment motion of defendant New Jersey Bell will be granted in its entirety and all claims as to it will be dismissed. Partial summary judgment will be granted in favor of defendant O'Brien insofar as plaintiffs seek to impose liability on him for acts occurring prior to 1984. As to plaintiffs, all the claims of plaintiff PBA Local No. 38 will be dismissed, inasmuch as the court finds that the PBA lacks standing to bring this action or, in the alternative, that summary judgment in favor of defendants is appropriate as to its claims. As to the counts of the complaint, the Fifth and Sixth Counts of the third amended complaint will be dismissed as to all defendants. In addition, the § 1985 conspiracy claim of the Fourth Count will be dismissed, plaintiffs not opposing summary judgment as to that claim.

In addition to the elimination of defendants, plaintiffs, or counts, the court's decision on the motions also eliminates portions of certain of the claims of the individual police officer plaintiffs in the First through Fourth Counts against the Woodbridge defendants, Galassi, O'Brien, and Zirpolo. As to plaintiffs' § 1983 and related conspiracy claims (First and Fourth Counts), those claims will be dismissed as against the Woodbridge Police Department; summary judgment will be granted in favor of all defendants insofar as these claims seek to rely on phone conversations on beeped telephone lines; summary judgment will be granted in favor of all defendants as to the claims of plaintiffs Polhamus, Trainor, Hodes, Festa, and Schreck insofar as these plaintiffs seek

to rely on conversations occurring over un-beeped telephone lines; defendants' motion for summary judgment regarding plaintiff Schreck's allegations that his conversations taking place in the radio room were inter-cepted will be denied; and the Woodbridge defendants' motion for summary judgment on these claims because recovery should be deemed precluded by the remedies available under the Federal Wiretap Act and the New Jersey Wiretap Act or, in the alternative, because plaintiffs cannot show that the ac-tions complained of were taken pursuant to municipal policy, custom, or usage will be denied.

As to plaintiffs' claims under the Federal Wiretap Act and the New Jersey Wiretap Act (Second and Third Counts), defendants' motion for summary judgment on these claims insofar as those claims rely on conver-sations occurring on beeped telephone lines is denied; defendants' motion for summary judgment as to the claims of plaintiffs Polha-mus, Trainor, Hodes, Festa, and Schreck in-sofar as they seek to rely on conversations occurring on unbeeped telephone lines is granted; defendants' motion for summary judgment regarding plaintiff Schreck's alle-gations that his conversations taking place in the radio room were intercepted will be de-nied; and the Woodbridge defendants' mo-tion for summary judgment because munici-palities cannot be held liable will be denied as to plaintiffs' claims under the Federal Wire-tap Act and granted as to plaintiffs' claims under the New Jersey Wiretap Act.

With respect to the remaining motions by defendants, defendants' motion for summary judgment based on statute of limitations grounds will be denied; defendant Zirpolo's motion for summary judgment as to all claims against him will be denied; the Wood-bridge defendants' motion for summary judg-ment as to all crossclaims for contribution and indemnity against them will be denied; and the Woodbridge defendants' motion for summary judgment as to plaintiffs' punitive damages claims against them will be granted.

Finally, plaintiffs' motion for leave to file a fourth amended complaint will be denied, the court finding that such amendment would be futile.

## ORDER

This matter having come before the Court upon the motions of defendants for summary judgment and upon the motion of plaintiffs for leave to file a fourth amended complaint; and the court having considered the submis-sions of the parties with respect to all mo-tions without oral argument, pursuant to Fed.R.Civ.P. 78;

IT IS, for the reasons expressed in this court's Opinion of even date, on this 9th day of September, 1993, hereby

ORDERED that the motion of defendant New Jersey Bell Telephone Company is granted and all claims as to it are dismissed; and it is further

ORDERED that defendant O'Brien's mo-tion for partial summary judgment as to all plaintiffs' claims against him insofar as they arise from acts occurring prior to 1984 is granted; and it is further

ORDERED that all the claims of plaintiff PBA Local No. 38 are dismissed; and it is further

ORDERED that the Fifth and Sixth Counts of the third amended complaint, as well as the § 1985 claim of the Fourth count, are dismissed as to all defendants; and it is further

ORDERED that as to plaintiffs' § 1983 and related conspiracy claims (First and Fourth counts of the third amended com-plaint), those claims are dismissed as against the Woodbridge Police Department; sum-mary judgment is granted in favor of all defendants insofar as these claims seek to rely on phone conversations on beeped tele-phone lines; summary judgment is granted in favor of all defendants as to the claims of plaintiffs Polhamus, Trainor, Hodes, Festa, and Schreck insofar as these plaintiffs seek to rely on conversations occurring over un-beeped telephone lines; defendants' motion for summary judgment regarding plaintiff Schreck's allegations that his conversations taking place in the radio room were inter-cepted is denied; and the Woodbridge defen-dants' motion for summary judgment on these claims because recovery should be

deemed precluded by the remedies available under the Federal Wiretap Act and the New Jersey Wiretap Act or, in the alternative, because plaintiffs cannot show that the actions complained of were taken pursuant to municipal policy, custom, or usage is denied; and it is further

ORDERED that as to plaintiffs' claims under the Federal Wiretap Act and the New Jersey Wiretap Act (Second and Third Counts of the third amended complaint), defendants' motion for summary judgment on these claims insofar as they seek to rely on phone conversations occurring on beeped telephone lines is denied; defendants' motion for summary judgment as to the claims of plaintiffs Polhamus, Trainor, Hodes, Festa, and Schreck insofar as they seek to rely on conversations occurring on unbeeped telephone lines is granted; defendants' motion for summary judgment regarding plaintiff Schreck's allegation that his conversations taking place in the radio room were intercepted is denied; and the Woodbridge defendants' motion for summary judgment because municipalities cannot be held liable under the acts is denied as to plaintiffs' claims under the Federal Wiretap Act and granted as to plaintiffs' claims under the New Jersey Wiretap Act; and it is further

ORDERED that defendants' motion for summary judgment on statute of limitations grounds is denied; and it is further

ORDERED that defendant Zirpolo's motion for summary judgment on all claims against him is denied; and it is further

ORDERED that the Woodbridge defendants' motion for summary judgment as to all crossclaims by codefendants for indemnity or contribution is denied; and it is further

ORDERED the Woodbridge defendants' motion for summary judgment as to plaintiffs' punitive damage claims against them is granted; and it is further

ORDERED that plaintiffs' motion for leave to file a fourth amended complaint is denied.